Good morning, your honors. My name is Malvina Nathanson, and I represent Edwin Ferrer. At just about the time that the suppression hearing was started, Mr. Ferrer had a very difficult choice to make, whether he was going to represent himself or whether he was going to represent the Supreme Court. He was going to go with an attorney in whom he had no confidence. But hadn't that choice been provided to him the last time he fired a lawyer, when he was told, this is the last time you're going to get one? I'm not. Next time, you're going to have to make that choice. I'm not at this point questioning whether he had to make the choice. I'm accepting that at this stage, that was his choice. What concerns me is that he was not provided any kind of guidance, any kind of advice, any kind of anything in making that choice. What choice are we talking about? Whether he was... What his options were. To represent himself or to be represented by Mr. Siegel. Mr. Siegel says he wasn't going to represent him anymore. Well, he did in fact stay on as an advisor. That may be, but the choice was not to have Mr. Siegel, who was bowing out, or represent himself. What was the choice? I don't agree that Mr. Siegel was bowing out. First of all, if Mr. Siegel was refusing to represent him, then he had no choice at all. And that, it seems to me, is a constitutionally untenable situation to place him in. But you're not arguing that. Well, because I'm not arguing that Mr. Siegel said, I refuse to represent him no matter what. He asked out and... He stated that there had been problems, that the client had been hostile, and that there had been some need for the officers to intervene at some point. But I don't think that he would not have... I do not believe that that was the situation. Except for the threat of violence, the relationship was not... Well, there was no factual exploration of exactly what that entailed, Judge. What do you think the district court should have done? I think the district court should have said to Mr. Ferrer, if you represent yourself, you've got to understand how hard that's going to be, and here are all the problems. I mean, as the Supreme Court puts it, to be told about the disadvantages of self-representation, he wasn't told anything. He was just said, you want to represent yourself? Go ahead. I'm curious as to what that means. Let me tell you about the disadvantages of representing yourself. You don't have a law degree. That's sometimes handy to have one. There are rules of evidence that you will be required to follow, that attorneys plan a strategy, that there's thinking through what the case is about. The man, if you witnessed his performance at the hearing, had no idea what he was doing or what he should be doing. He had no idea how to ask questions. He barely asked any questions. He didn't know how to. He wanted to ask some questions based upon the hospital records. He was unable to get them. Judge Scullin had just said there are rules of evidence that are handy to know. That would have been sufficient? You know, that's hypothetical.  At this point, we don't have that in the record. But if you look at the cases, even the cases cited by the government that discuss the situation when it's okay, you've got a case, for example, of a defendant who is an attorney. He was allowed to go pro se. You will see, and we discussed it in the reply brief, you will see cases where the judge has a lengthy discussion with the defendant to make sure the defendant understands what the choices are and what could happen. You're talking about . . . what you're saying is as if this were . . . from day one, he said he wanted to go pro se, and you had to make a forerunner inquiry. The judge would have to go through all of the . . . I don't think he ever actually said he wanted to go pro se. What he wanted was a lawyer that would believe him and would work for him. I do not know what the problem he was having with his lawyers, but I do know from the record anyway that he did not . . . He wanted a lawyer. He always wanted a lawyer. He just wanted a lawyer that he felt more comfortable with. I'm not sure how I would have solved that problem. He wanted a lawyer who said that he believed his rather implausible story and did not urge him to take a plea, which would seem to be very good advice. I don't disagree with that, but again . . . Where would he find such a lawyer? He hasn't fired me, Judge, I have to say. We've had some correspondence on some of his issues, but that's not in the record. Suppose he had had counsel at this suppression hearing. What question would be asked of whom that would have made any difference? I think that there would have been at least a thorough exploration of what the medical records show. This is a guy who was taken to the hospital, almost bleeding to death, was in some jeopardy, and presumably was . . . You bleed whether somebody shoots you or whether you shoot . . . No, I understand that, but the question is . . . By the way, the search of the car is not at issue, but the statement that he made is at issue. And so the question is whether or not he had full possession . . . Didn't he make the most critical statements to the nurse? After he . . . He said he shot himself to prove that he was in possession of the gun. Yes, yes, and he said that later as well. He maintained that story. But the question is, what was his condition at the time that he made that statement? Was he thinking clearly? Was he able to think clearly? Was he under the influence of pain medication? I mean, none of those questions . . . There's a question of voluntariness involved, and none of those questions was explored at the hearing. I don't know what the result of the hearing would have been. I just . . . I ask you one more question. Certainly. Suppose we agreed with you. You wouldn't be entitled to a new trial, would you? We've asked for a new hearing. Just a new hearing. We haven't asked for a new trial. We've asked for a new hearing on that issue. That's correct. This was litigated at the trial as well, wasn't it? All of the evidence that would have come out at a suppression hearing was litigated at the trial, and he's entitled to have the jury determine the voluntariness as it relates to the truthfulness of his confession. After a suppression hearing finding that was made after full attention to his constitutional rights. But the strategy at a hearing is different from the strategy at a trial. The evidence wouldn't have been different. The way in which you argue and hearsay is available at a suppression hearing . . . I mean, it's impossible to know, I think, based on this record, what the result of a counseled suppression hearing would be. And the fact that at a later stage in a different kind of proceeding, a jury did not find that his initial statement was . . . Well, we don't know what they found, but . . . I'm not talking about . . . I mean, the Supreme Court has said that . . . I think it's Jackson versus Denham that you have to have an independent hearing by a judge. All I'm suggesting is that we now know all of the evidence that would have come out at a suppression hearing, and what reason is there to believe that it would have been any different? Well, I . . . That the result would have been any different. I'm sorry, Judge Gorman, I don't agree with that. We don't know what would have come out of a suppression hearing. We don't know. First of all, it was a different attorney. But, we don't know if the attorney at the suppression hearing would have asked the same questions that the attorney at the trial would have asked. We just don't know that. The evidence might have come out differently. There might have been strategic reasons at the trial for the attorney not to have explored things that he might have been willing to explore at the suppression hearing. The defense . . . We just don't know, because it just never happened, and I don't think that we can speculate on that. You've reserved . . . I have, which I will, I guess . . . Well, you could use now if you . . . No, no, no, no, no. I want to hear what the government has to say. Thank you. And we shall. Thank you. May it please the Court. Karina Schoenberger for the United States. Mr. Ferrer has not identified any errors that would entitle him to a new suppression hearing. The district court could have decided and did decide under the totality of the circumstances . . . Then, you're asking us to decide harmlessness beyond a reasonable doubt, I think. Is that what you're . . . That's correct. I think under the totality of the . . . Well, why wouldn't we send it back and ask the district court to decide whether any failure, if there was a failure, was harmless beyond a reasonable doubt? We can determine on the existing record that if there was an error, which the government doesn't concede that there was, but if there was an error, it was harmless, and it was harmless for at least three reasons. First of all, because Mr. Ferrer was not denied assistance of counsel. His suppression motion was written by an attorney, and presumably it presented what an attorney believed to be the strongest arguments on suppression. He also had standby counsel available to him at the suppression hearing. Second, this was not a trial situation. It was a pretrial hearing. It was a critical stage of prosecution, but it didn't present the same dangers and risks of representing yourself pro se at trial, and that is something that this course discusses in the DiLeo case and talks about the different factors that make a pretrial hearing different. For example, limited to straightforward issues, the very issues here, whether Miranda was required . . . But his right to counsel is not diminished as a result of this. His right to counsel is not diminished, but the risks of self-representation are diminished, in part because the hearing is conducted by a judge who can more easily overlook evidentiary missteps than a jury could at trial. But the third reason this is harmless is because there is just nothing in the record to indicate that the decision on the suppression motion would have come out any differently, either if there had been counsel representing Mr. Ferrer at the hearing or if he had been warned about the dangers of self-representation, which is really the heart of what the argument is on appeal. And that is because at trial, Mr. Ferrer testified and the same witnesses that testified at the suppression hearing were subject to cross-examination. And the best that Mr. Ferrer could say about the time that he gave his statements to the police in the hospital was that he didn't remember talking with them. And even when he was speculating as to why he would have told them that he shot himself in the hospital, he didn't say it was because he was unconscious or anything like that. He said it was because he was scared of retribution about the person that he alleged had actually shot him instead of him. So he couldn't have shown that there was police coercion at the time those statements were given because there was no evidence that he presented, even when he was represented at trial to undercut the testimony of the law enforcement officers that took his statements. And there was nothing to show that although he had recently had a traumatic injury, the shooting, that he was unconscious or somehow incapable of giving voluntary statements or making voluntary choices. And I would also say just to respond to this point about whether or not the attorney was refusing to represent him at the suppression hearing. He was not. He did ask to be relieved as counsel and he said he was ready to go forward that day, but he didn't want to because he had not had any client input because of the conflict that they had. Doesn't that amount to the lawyer saying I can't do this, meaning I won't do this? He didn't say he wouldn't do it. But what he said, the question was, do you wish to go forward pro se on this hearing today? And he said, I wish, but I'm not prepared because I don't even know what's going on. That's correct. That's what the defendant said. Correct. But the district court was permitted to give him the choice. You either take this third attorney that's been appointed to you or you go forward pro se. And there wasn't a complete breakdown of the relationship between Mr. Siegel and Mr. Ferrer because even in the standby capacity, he continued to represent him. There's a later proceeding where Mr. Ferrer is slated to plead guilty and ultimately he decides not to. But before that point, Mr. Siegel describes how he went to visit Mr. Ferrer. They went over the plea agreement together. He got his signature on it. So there continued to be a relationship even after the suppression hearing. At the trial when he was represented by a different counsel, did the new lawyer ask the judge to in any way reconsider his finding that the confession was voluntary? No. There was never any revisiting of the suppression decision. On appeal, Mr. Ferrer has also raised some alleged errors at trial. Again, he has not identified any errors that would entitle him to a new trial. The questions that the government asked him on cross-examination were entirely proper. I mean, even if we agree with you they're proper, it just seems odd that Judge D'Agostino gave an instruction that said the jury wasn't allowed to consider essentially the arguments that were made by the government in summation, right? That's true. There was reference to Mr. Ferrer's status as a felon during cross-examination that nobody objected to. Prior to that point, the parties had stipulated to the fact that there was a prior felony conviction that was not entered into evidence with any kind of limiting instruction. I mean, the argument that the prosecutor was making that because he knew he was a felon he wore gloves doesn't actually make a lot of sense to me. There were no fingerprints because he was wearing gloves. And the fact that whether he knew or he didn't know that he was a felon strikes me as being totally irrelevant. It doesn't mean necessarily that it's reversible error, but it just strikes me as a kind of absurd argument. Well, on cross-examination the defendant volunteered himself that when he was shown the gun as physical evidence to identify he said, oh, they didn't find any prints on it. And then when he was explaining his version of the events to the prosecutor he said, oh, I wasn't wearing gloves at the time. And so I agree that it's, I mean, this was not a fact that was going to make or break the case, but it was something in dispute. And there was reason to suggest that he would have taken steps not to leave forensic evidence on the gun because he had this prior conviction and knew that he was prohibited from possessing a firearm. In any event, during the summation this fact was already in evidence and the prosecutor was entitled to reference it and ask the jury to draw inferences from it. The district court sua sponte decided to instruct the jury that it should be considered for a limited purpose. And so even if there was any potential prejudice, it was cured by that instruction. And even if there was any prejudice that was introduced by the government, it didn't raise, rise to the level of flagrant abuse. And the defense counsel himself asked the jury to draw inferences from that same fact, opposite ones. In fact, saying, you know, this Mr. Ferrer is a felon and so he would be concerned about law enforcement finding the gun. That might be why he gave inconsistent statements to law enforcement. So neither the question on cross-examination nor the statements in summation were an error, but in an abundance of caution, the district court did give a curative instruction. And so on appeal, they certainly can't find that there is error entitling him to a new trial. Could I ask you to go back to the earlier issue? If the defendant says he doesn't want a particular lawyer and the judge says he's not appointing any other lawyer, is the judge obligated to give him any instructions as he would at the outset if the defendant did not want a lawyer about the risks of going forward that he who has a fool . . . he who is his own lawyer has a fool for a client, which is a line that I use in these circumstances. I don't think that the requirements change based on whether the defendant asks that at the outset or whether he's given the choice. Right. The Ferretta warnings this court has decided are not required. It needs to be a knowing, voluntary, and intelligent choice, but how the district court judges that is not . . . the defendant chose to represent himself pro se. But what sort of risks . . . I mean, Ms. Nathanson talks about the imperative of instructing a defendant on the risks of representing himself or herself. So none of that happened here, right? There was no discussion of that. That's true, except for the district court saying you either take an attorney or you have to go forward on yourself. That doesn't really explain the risks. And on the prior occasion, when the judge said, okay, I'm appointing a lawyer, but this is the last one. After this, you're on your own. Again, no discussion of the risks of going forward. That's true. And so I ask Ms. Nathanson the same question. What sorts of risks should the court be instructing a defendant on? Other than obvious pablum like it's good to have a law degree. There are rules of evidence. Sometimes experience is a good thing. Well, one of the questions that this court grappled with, although in dicta, was in the DiLeo case, and this was in one of their footnotes and talking about how it was not clear what the risks were, particularly at this pretrial stage that needed to be disclosed to the defendant. I think some of the factors that you raise are ones that . . . Don't you need to know the law as it relates to how you determine the voluntariness of a confession, the interrelationship of Miranda and the voluntariness, and inextricably intertwined with knowledge of the law is how you frame questions and what arguments you make. All of this is a defendant without a lawyer is at a substantial disadvantage. Now, I am sympathetic. I have had to deal with this myself where a lawyer . . . Defendants come in for endless requests to change lawyers on the same grounds that are present in this case. I understand the judge's frustration, but I'm just addressing what you would say to a defendant, and it doesn't take very long. I think it bears noting that the defendant doesn't have to be found competent to represent himself as a lawyer would, but rather competent to make the decision to represent himself.  There's no real question that it would have been preferable to have a longer colloquy, and although the Ferretta warnings are not required, it is preferable to have them. But again, based on the totality of the circumstances and all that had occurred in this case and the defendant's conduct, the district court could find that he was intelligently, knowingly, and voluntarily waiving his right to representation. Could, but didn't do it in this instance? He did not make an express finding, but by allowing him to proceed pro se, he had plainly decided that that request had been made and was allowing it to happen. Could the judge . . . if we . . . suppose we agreed with the defendant, would we have to remand for another hearing, or could we just remand to the judge to decide the issue based on the record of trial? I believe you could remand for a finding of whether there was harmless error here or not. No, no, I'm not talking about specifically harmless error, but judge, what would you have found? Would you have made the same finding based on the same evidence you would have heard at trial, that you've heard at the suppression hearing? Why would we need a separate suppression hearing if we were going to rule in the favor of the appellant? Correct. I'm not sure a separate suppression hearing would be required, Your Honor. And certainly, it doesn't sound like you're contemplating this, but certainly his conviction would not need to be overturned based on this. Thank you. Thank you very much. Ms. Nathanson. A couple of very quick points on the counsel problem. One of the things that happened at the suppression hearing is that the judge made his suppression hearing ruling based on a mass of exhibits and non-record statements. The statements, I gather, of witnesses that never testified because the defendant said that they didn't have to testify. I don't know what he meant. So this is not the same as the evidence that was at the trial. This was other stuff that probably couldn't have come in at trial because it would have been hearsay. But I wanted to focus on two things on the question of the felon questions and use of the felon in summation. First of all, when the judge gave the jury the instruction about the limited use of that information, the instruction itself was, I think, inadequate. The judge said that you can only use the information that he was a felon in order to determine if he was guilty of possession of a weapon as a felon, but did not clarify that you could only use it with respect to whether he was a felon and not with respect to whether or not he was in possession of the weapon. So the judge's instruction didn't really cure whatever error existed. And also to point out— Was there any real doubt as to whether he was in possession of the weapon? But the question was whether or not the possession was a knowing possession. He said that he was in possession, and he admitted he handled the weapon, which is what makes the questioning about the gloves so unnecessary. But it would have been, I guess, what one would call a temporary innocent possession, that the only reason he was in possession of the gun was because these carjackers had thrown the gun into his car and he handled it and moved it to the back of the car or something like that. So there's no question about that. But, again, what kind of possession it was. And the government in—excuse me, too many state cases. The government in summation really used the fact of being a felon as evidence of guilt, didn't talk about his being a felon as evidence that he must have been wearing gloves, but said this kind of person, the kind of person who's a felon, someone who commits a felony, and he was really asking the jury not to believe the defendant. And the whole case had to do with which version of the defendant's story should be believed, what he said at trial and what he said at the hospital. And basically the government said don't believe him now because he's a felon. So it was very prejudicial on the only issue in the case. Thank you. Thank you. Thank you both. We'll reserve decision.